I call the last case of the day, Da Vinci Investment v. Charlie Parker, et al. We'll start with Mr. Voss. May it please the Court. Good morning. I'm Ed Voss, and my appearance here today is on behalf of the appellants in this case, Charlie Parker, Katherine Weilman, Sherry Capehart, Jimmy Bennett, and Michael Glaspie, who are council members for the City of Arlington. This Court should reverse the decision of the District Court and render a decision in favor of the appellants on account of their absolute immunity and or qualified immunity defenses. This appeal arises because of the District Court's denial of the appellant's dismissal motion that was filed pursuant to Rule 12 of the Federal Rules of Civil Procedure. For convenience, I'll refer to the plaintiff in the case, the appellee here, Da Vinci Investment, as DVI, and to my clients as the council members. In its simplest terms, this is a case about DVI's unhappiness with the council members' vote and their decision on a zoning matter concerning DVI's development plan that was presented to the City Council. The facts are fairly straightforward from my perspective. I think that DVI's allegations are much more lengthy than I'm going to talk about. But since this is an appeal of a Rule 12 motion denial, we're looking at the plaintiff's complaint and the Rule 7a reply that was filed by DVI. I'm also going to be referring to the City Code provisions, which were reviewed and judicially noticed by the District Court, and we requested that this Court judicially notice those provisions as well since they're matters of law and also matters of public record. DVI submitted a development plan application to the City of Arlington back in 2013. It's sometimes referred to in the pleadings as DP13-1. It is a proposal to develop a car wash on DVI's land, which is zoned a planned development district, PD91. That planned development district was established in 1991 by DVI at its request, and the current application that they asked for was to develop a car wash there, which was one of a number of uses that could have been allowed there. But under the Arlington Unique Zoning Code provisions, the first step is getting the PD zoning. The second step, the second zoning event under Arlington's regime is to get a development plan approved in a zoning proceeding. That is part of the main contention. You say the first step is to get what now? A planned development district established, the PD91 in this case, and then the second step is to, in this case, was to get a development plan approved so that building permits could then be issued for whatever was approved under those listed uses that are set forth in the PD. And I guess there's no limit with regard to how much time expires between step one and step two. It could be a hundred years later. That's correct, Your Honor, and in this case, it was a number of years later, since 1991. Along the way, there were a few other developments along, because this was not just a single couple-acre tract that was subject to the PD. PD91 covered several acres, and from time to time, DVI had developed other portions of it, and that's in the pleadings. This particular matter concerned a car wash that they wanted to develop there, and that was one of between 90 and 95. Well, let me ask you this, because I guess I'm having a problem with this concept that this is just a step in a process, and that it's all part of the zoning process. So if a decision is made in 91 about whether or not it can be zoned for planned development, and I want you to correct me if I'm misspeaking, but I think that's what occurred in 91. So is that an appealable decision? The 91 decision, would somebody have been able to appeal it? Let's say somebody didn't want it to be zoned planned development. Could you appeal that in 91? Well, I'd say that's a legislative event, and I would say no. You can't sue the council members over it like we're here today about. So those who feel aggrieved by the determination that it could be zoned for planned development have no avenue for appeal of that decision until 100 years later when somebody tries to get the specific plan approved? I wouldn't even say it was an appeal of that decision, and I wouldn't go so far as to say they don't have any avenues. All right. They can go to the ballot box, because this is a city council, and it's the governing body of the city of Arlington, and they're elected officials, and they're making legislative decisions. So just vote these people out. And that's the remedy there, to vote them out. And so in this case, the development plan was submitted, and admittedly, Arlington's code provisions are unique, and that's part of, I think, perhaps why this case is here, because Arlington has a unique set of provisions that say not only that the PD is part of the zoning process, but also the approval of the development plan in this PD is part of the zoning approval process. I think another reason this one is here is the elephant in the room who's not a party, and that's Poynter. Well, part of the background politics was neighbor's dissatisfaction with what the application presented, whether it was Mr. Poynter or whether it was Mr. Haddad or some of the other folks that are set forth in the attachments to the Rule 7A reply. And to me, and I think part of our approach in this case is that's part of the legislative process, the legislative political process. And so in that sense, that goes to Judge Graves' point just a minute ago that if there's dissatisfaction with how the legislators vote, then the answer is at the ballot box. But in this case, there was a process, and it was a zoning process, where first the application was submitted, and then after it was submitted, then the first step in the process was for the Planning and Zoning Commission to rule on it. Well, are your clients elected? They are elected. They're the elected members of the city council. Are they by zone or area, or are they citywide? I want to say that they're by district. They have place numbers. And so there's nine, and these are the five who voted down the development plan. It was a five-to-four vote, and these are the ones who got sued for their vote. But before that, there was a Planning and Zoning Commission hearing, and this development plan was reviewed then, and it was voted down. So then DVI had the option to appeal to the city council. So the first step that the city council had was whether or not to accept the appeal procedurally. Then the second step was if they decided to accept it, and here they did, the next step was then to rule on the development plan application on the merits, and that's what they did. And then that resulted in the five-to-four vote, and then this lawsuit was filed a few months after that, and it was removed to federal court after starting off in state court because DVI was asserting that its equal protection rights were violated and that its substantive due process rights were violated. DVI also added a state takings claim, but that's not part of this appeal. Well, over half of your time is gone. I know you're trying to make sure we understand how this process works. My concern about the case, and it's certainly addressed, and maybe it's the uniqueness of Arlington's approach to this, but my understanding is after the PD was approved, or whatever the word is for that, among the allowable uses of the property, the one lot that we're talking about here was as a car wash. Time moves along, and the owner of that property is ready to develop as a car wash, either itself or through some contracting party. You're calling that second decision a zoning decision as well, and I think you've cited two or some cases like Weingarten, which is not published. It was very much a rezoning case, and so as long as you can keep this in zoning, you feel you're pretty good. What do I know? But that's my sense of your position. But once it's been established as a allowable use, why is the approving of somebody who wants to use that property as one of the allowable uses, why is that a zoning decision? Well, it is because that's the way Arlington set it up. Under the local government code in Texas, home rule cities are provided the authority to set up their zoning rules and procedures as pretty much as they see fit. Well, but one problem with that is I think when you're looking at the rights of individuals such as what we are dealing with here, I'm not sure the city can protect itself just by labeling an activity something that would remove it from judicial review. So it needs to be truly a legislative decision and not just called zoning legislative decision. What makes this? Is it totally discretionary? Are the ordinances that I've seen, which I must say it's sort of hard for me to sort out what's going on from reading the ordinances, is it what would you point us to to say that it's clear from Arlington's ordinances that there is no right, even though this was approved 20 years ago for use among other things as a car wash, there's no right to that and deciding whether to permit it is a discretionary legislative decision. Well, I will start with the ordinances, and that would be as we've provided in our briefs, Section 5-100, 5-200, 5-300, 9-300 that list the procedures and that specifically state that a zoning change in Arlington includes development plan applications. But I think the court mentioned a minute ago the Wine Garden case, and I do point to that as a factually similar case with one acknowledged difference. Wine Garden was a rezoning in the sense of changing the zone from one, and I can't remember exactly which one it was, but it's such as going from retail to ag or ag to retail or something like that. But in that case, it was regarding a fairly discreet set of properties, and it was 45 acres instead of a couple acres here. But the argument presented by the landowner in that case in Wine Garden is similar to what's being argued here. This is a specific decision on one piece of property. And in Wine Garden, the court said, well, no, it is a case about zoning. It affects not only DVI, the owner, but it affects the neighbors. There were neighbors in favor of it. There were neighbors in opposition. It affects contracts. Besides the neighborhood ramification, it was a politically charged legislative decision that set forth in the Rule 7a reply and also in the complaint. Well, in that case, there was a vested interest in keeping it agriculture. Here, there's a vested interest in keeping it as the way it is zoned and letting the permitted use go through. Well, I understand the interest there, but Arlington had set it up so that they can review the development plans that are submitted in the context of the neighborhood and the surrounding area. So that's why I say this is not a zoning issue. Well, the plans that are submitted is one thing. The use is another. This was not rejected on the plans, as I understood it, but on the use. I would respectfully disagree that this was a plan review, and it wasn't denied so much. As DVI is arguing, they're arguing that it was a use denial on the one hand, and then they argue that the opposition was coached so that they could artfully say it was not a use denial. I mean, it was not a use issue as it was a development plan issue. You mean a car wash would have been okay with different architectural plans? That's right. That's what the discretion was given to the city council under their ordinances, is to review with discretion the features. And I listed those discretionary points in the Arlington Code on pages 34 through 37 of our brief that show that this decision wasn't just a building permit type decision. Or it wasn't a ministerial decision that if they met conditions 1, 2, 3, and there were quantitative standards that were met, then it should have been approved. All right. Did they have an opportunity to redesign it and keep it a car wash? They redesigned it several times through the process. And so the point that DVI wants to make is that staff was happy with it, therefore it should have been approved, but the ordinances don't read that way. The ordinances give the discretion to the city council. Well, it's starting to sound like an abuse of that discretion. Well, I will submit it's not, because these are elected officials who get to make the choice, and because they are elected and they make the decision, they're entitled to legislative immunity. And that's about this. I'm running out of time, but that is our primary point to urge. And in connection with that, and I know you're running out of time, you also claim, don't you, that they're entitled to quasi-judicial immunity? I do. And that's the second part of the absolute. Well, isn't that kind of intention with the contention that they're entitled to legislative immunity? Well, the argument being made by DVI is that the process was slanted against them, and so they skip over the appeal process that is set forth in the Arlington Code. And so it was structured as an appeal, but my point is, as far as getting to the city council, but the decision of the first assert is legislative on the discretionary aspects of the development plan. Okay. Thank you, Councilor, you'll have time for rebuttal. Good morning. My name is Michael Hassett. I am here representing Da Vinci. I would call him Da Vinci because I've always called him Da Vinci, and I represent Da Vinci at the trial court level as well. At the outset, I have to say that I believe that Judge O'Connor, our trial judge, got it right on the 12B motion that Da Vinci had adequately alleged facts and claims that would remove the defenses of immunity that are asserted by the individual council members in this case. And therefore, he properly denied the 12B dismiss motion. To start with, I will acknowledge, and Judge Southwick, I think you hit on exactly why it is that the individual council members want to make this what they continue to call a zoning event. Because the case law is generally that zoning, that is affecting the uses allowed on specific property, is typically considered by the courts to be a legislative act. And that has to do more with the use of the property than the event that the city is calling it. And that's the reason why the city continued, or the council members here, continued to call it a zoning event. The car wash use in this case was approved in 1991, and that PD is a planned development district that is established whenever an applicant comes and says, I want to put this in a planned development district. And it really does provide for some safeguards for the surrounding community. There's going to be architectural standards that are set out in Arlington ordinances, design protocols that have to be met. I know you want to get a bigger picture, but let me ask you about that. The position of the city council members is that we've done nothing to change the authorization of the PD. Car wash can still go in here. The problem is the design. And my understanding from the city council, meeting explanations that I've read in briefs, there was no statement by the city council as to why they were denying it. To the extent this is a potentially a design decision, and a car wash, by golly, can go in there sometime if you just come up with the right design. What's the best argument from your point? Either that you need an explanation as a matter of right, or on the flip side is that this kind of arbitrariness just would allow the council constantly or forever to deny a use that they have permitted by saying it's a design. I mean, legislative decisions can be very arbitrary. So we need to get out of that for you to have some right to proceed, at least in light of legislative immunity. There may be other arguments. So how do you respond to this idea to whether you need it and have a right to insist on some explanation where you can basically fix whatever it is they are saying is wrong? Or maybe on the flip side is this changing target, if that's what it is, just creates an arbitrariness that's a violation of something. The answer starts with Section 9300B of the Arlington Ordinance, which is found in the Record on Appeal at page 485, that says that once a PD is established, the uses allowed in that PD are established at the time the PD ordinance or the PD district is approved. So if they had said we don't want a car wash there, go away, what would your right have been? If they would have said that in 1991, then we wouldn't be here today because we wouldn't. Oh, no, but they said that in 2000, whatever the right date is, 13. What would your right to challenge that have been? Well, then we have a different right because we have a right to an established zoning use that we have paid taxes on and continue to use, and the case law would protect that. It's a different claim than what we have here. But here we have the two-step process. It's not really a two-step process. It's we need to apply for a development plan application, and those procedures are set out in Section 9300. And 9300E says these are your minimum performance standards, and 9300F says these are some design guidelines, and those all look at very specific facts to your plan, to what's going on in your four corners of your piece of property. And the legislative immunity, the absolute legislative immunity that is discussed in the cases here says legislative decisions are protected. But legislative decisions are ones that are policy-based, that review facts that have to do with the policy. And I side of the court to the Bartlett opinion, which is a Texas Court of Appeals case, obviously not binding on this court. But it is the closest factual case to what we have here because it involved a development plan application for a movie theater. But that case goes through the Hughes analysis, which demonstrates that the function is what matters. It doesn't matter who's involved in the action and the conduct. It doesn't matter what they call the conduct. Therefore, it doesn't matter what the Arlington Ordinance actually calls this. It's if you're looking at legislative-type facts, then it's legislative, and legislative immunity would apply. But policy-based facts are those that govern future conduct for all or a class of citizenry. Once you get beyond that and start enforcing certain statutes, design guidelines, minimum performance standards, as are set out in this ordinance, then it is executive or administrative in nature, and absolute judicial immunity or absolute legislative immunity does not apply. And here, that's exactly what we had. These performance standards talk about height restrictions and setbacks on the particular property, what landscaping needs to be where on the particular property, where you can put signs on your building, what minimum parking spaces must be there, and then you get to the kicker, which is— So your position is that legislative immunity would attach to what occurred in 91? Yes, Your Honor. I believe that that is a legislative act when you create a new zoning district. That's separate and apart from the recent acts? Yes, and the kicker and the difference is on the development plan review, the ordinance says, here are the things that the council and the P&Z should consider, and they're all very specific targeted items related to this property and this property only. They're not broad policy-based. All right, let me interrupt just for a fact. Council opposite said there were more than one set of plans and specs submitted. How many were there? That's a good question. There were so many changes. I don't know if I can tell you an exact number. The plan, the final plan that went to the city council that we're here on actually met every single one of the design guidelines, every single one of the minimum performance standards, and eight out of nine of the opposition objections. And the staff or the professionals, whatever you call them, had signed off on this? That's right. In fact, the staff report was free of objection, indicated that this use was permitted, indicated that the use wasn't going to negatively impact the surrounding areas, and indicated that the design guidelines have all been met and there would be no traffic impact. Now, what the council has and what Mr. Voss alluded to in this discretion is the section 9300E of the guide ‑‑ I'm sorry, it's 9-300E9. There is an additional provision section that says that nothing in that ordinance should limit the council's ability to require more restrictive standards if necessary to protect the public's health, safety, and welfare. And what we complain about here, this is what takes it out of the realm of legislative activity because the council is looking at restricting design guidelines, and they can be more restrictive, but our claim here is a claim that they cannot be more restrictive without telling us what those requirements are. They can't just deny. They can say, you're approved if you want to build an eight‑foot masonry wall all the way around it so it can't be seen. They could have said that, and that would not have been a legislative action, but that's what they could have done under the terms of their own ordinance, but they chose not to do that. Does the record reflect what Judge O'Connor ‑‑ did he have any record information on the reason for Poynter's objection? Is he a competitive developer or what that was? Or is the record just devoid of that? Well, I think the record's probably devoid of that, Your Honor, because this was a 12B motion, so it's simply what's in our pleadings. That's what was considered by Judge O'Connor. And we have certainly pled that these opposition were politically motivated, political donors, friends of these council members, and that's what takes it out of the qualified amnesty that I'll get to in a minute. Well, to the extent that there is authority under 9300 and so forth, that the council can require more to protect, and whatever the nice things are that they protect, public welfare, is that a legislative decision? That would not be a legislative decision, because we're still not talking about broad policy-based things that are going to affect all or a class of citizens. And there was no discussion at the council of whether or not there was an impact on public ‑‑ Was there an executive session, and then there was nothing in the public session, or this was just presented and whatever conversations there had been were outside of the council meeting themselves? Yes, Your Honor. What happened at the meeting was the presentation was made, immediately a motion was made to deny, second it, and approved with no discussion among the council members. Was there a follow-up explanation? I thought there was something later from the city that gave some, maybe in a formal order or otherwise, that gave some sort of general explanation. The motion that was made is the only explanation that was given. Charlie Parker is the one who made the motion, and he said, I don't believe it enhances neighborhood areas. I think there was one other part of it, but that was the gist of the motion that was made. It was not discussed anywhere else. And what gives you the right to that explanation? That almost sounds like a due process right. It is a due process right, Your Honor, and that's what we've asserted in this case. And it comes from the fact that the ordinance itself says that the council can require more restrictive standards if necessary, but they didn't require more restrictive standards here. They just flat denied it, and that's the arbitrary violation of our due process rights that we've alleged. I do want to touch on the qualified immunity as well, but before I do that, I'll just briefly touch on the judicial immunity. Yes, I believe it's inconsistent. I understand it's pled as an alternative here, but this just isn't a case of quasi-judicial immunity. The O'Neill case from this court says when something is functional, again, like Hughes. I'm kind of slow catching up. Could you specify for me again the specific property right that you claim was violated? Yes, we have two property rights. I know you just concluded that. Two property rights that we have alleged. One is a right to be free from arbitrary and unreasonable restrictions on the use, which is a due process claim under the state of Texas, under Texas law, that's been recognized by this court and Texas Supreme Court. And the other is our right to be treated equally as others who are similarly situated. It's an equal protection claim, which we have set out an equal protection claim because there was a car wash that was approved probably 3 to 4 miles away from my client's property two years before, and that is the Cooper Street car wash that is referenced in our brief. The Cooper Street car wash, the wash itself is virtually identical. It's a tunnel style. You drive through, and then there's separate vacuum bays where you can go self-vacuum, and it's attended. They're the same functional type of car wash. In the Cooper Street case, the city owned the land, and it was not in a PD. It was not zoned for a use that would allow car wash use. There was some opposition from residents who lived adjacent to that property, who lived in duplexes right behind that piece of property, and they came and opposed the rezone. That was actually a zoning change case where they zoned the property into a PD and allowed a car wash use on that over the objection of the residents who were next door. In our case, our property was already zoned for the use of a car wash, and we had the two immediately adjacent residential owners show up and ask the court to approve. They were in support of our development plan application. So we think we're treated differently, and we think we're treated differently, and we've alleged this on the basis of who the opposition was, politically motivated, political donors, and friends of these council members. So that moves into the—that's the qualified immunity. It's a two-step process. First, we have to allege property rights, and I think we've done that. I think we've certainly, on a 12-beat case, established an allegation that would give us a property right. And second, we have to plead that that property right was clearly established. By clearly established, that means it would be reasonable to assume that a local official would know that they were trampling on the rights when they did. And I think that's pretty evident in this case. We're not talking about novel case law here. This is basic land use regulation, and I think the trial court said it best when he said that Texas law and the Fifth Circuit clearly recognize that arbitrary limits on use is violative of due process rights, and that's what we have here. These are arbitrary, and that's our allegation altogether. But they are right that in this process, what occurred in 91, where you get it zoned to do some kind of planned development, whatever we call it, a step in a process, it's necessary. That had to occur first. Actually, it wouldn't have had to have been in a PD district. PD districts are just a little bit different. It's a heightened use standard because it does set out minimum design guidelines. My client could have come in 1991 and asked that this just be put in a general commercial zoning category. But instead, he asked that it be put in a PD district to ensure that the future uses would always be governed by those design criteria and the minimum performance standards. As time goes on, that leads to a more professional-looking development down the road. All right. So something had to occur. Something would have had to occur, not necessarily what occurred, but some step in 91. in order to get it to a commercial zoning. And the PD of this property was much more property owned by Da Vinci than just this little car wash segment. That is correct. It was a comprehensive on this landowner's bigger property. That's correct. And some of that has been developed into a daycare, a dry cleaner, a pharmacy, and then there's the residential piece. Which gets me to my follow-up question. Every time one of these other parcels was developed, was there a requirement that Da Vinci come back before either the zoning, I guess it's the zoning commission board, something, zoning and or the council in order to do all those other developments? Every one of those other developments. There's two steps or two possibilities under the Arlington Ordinance. You can either do it on a concept brief basis, which is just a, we put together, this is where everything is going to be and here you go. And it gets approved or they require you to submit a full development plan, which is on Mylar and sets out all the things that are supposed to be on the Mylar. And that's what happened in this case. All of the other ones were actually handled on a concept brief basis. What does that mean? That means it was submitted on much less detailed plans. Submitted to? To the planning department. And then they approved it. And the staff approved it. And so, and then there's probably some summary council approval. There's probably a summary council. I don't recall that specifically. Those things all occurred 15 years, 20 years ago. I've got about two minutes left. I do want to touch on the judicial immunity, quasi-judicial immunity. As I started to say, the O'Neill case dealt with a board of nursing. And in that case, they had to revoke a license for a couple of nurses. And the Fifth Circuit looked at that and said, yes, that's quasi-judicial because that board had the authority to administer oaths, to compel witnesses to come to that hearing, to receive testimony from those witnesses, and to administer punishments. And I would just submit that there is nothing about the process at issue in this case that is judicial in nature whatsoever. The city doesn't look at precedent. They didn't administer oaths to anyone there. They didn't compel any witnesses to come. They didn't take witness testimony. They didn't allow cross-examination. They didn't administer any punishment or judgment. And there is no appeal right other than going to federal court or we actually went to state court and assert your rights. So again, much like in the legislative function or legislative realm, this court looks to what the function is. Is it functionally judicial in nature? And here it just simply wasn't. Just like it wasn't functionally legislative when we got to the development plan process. The use had already been approved. So we don't believe that these immunities apply and we certainly believe that we have substantially pled our claims to defeat any claims of immunity, and therefore we ask this court to affirm the decision of Judge O'Connor. And I have 30 seconds left to answer any other questions. Thank you, counsel. You can use that. May it please the Court. I wanted to clarify one answer I gave a little bit ago after talking with my co-counsel here, and that is that the question was regarding the council members in their districts or are they citywide. Mr. Parker, this is in his district. Catherine Wildman and Sherry Capehart are in other districts, and Jimmy Bennett and Michael Glaspie are citywide elected. So some are single-member districts and some are citywide. In response to the comments that Mr. Hassett made about the question Judge Southwick asked about the design and whether there was a statement made about the design and why they ruled the way they did, as we submitted in our briefs, for legislators to make a statement explaining why they voted the way they did is not necessary for legislators, but Mr. Hassett did provide the correct account of the motion that was made and why it was made. The city has also been sued separately in this case. We're here on the individuals, on the council members, on their immunity defenses. I wanted to address briefly the cite by opposing counsel to the Bartlett case out of Dallas. That was a case that was, I think, unique, and because of its not only factual specifics, but also the guidelines that governed the counsel in that case make it unlike the case we're here today talking about so that it doesn't guide your decision. I'm leaning more and I'm asserting that the Weingarten case is much closer. In Bartlett, there was a plan development district and there was a process where the development plan was submitted, but I think one of the key differences in that case was that the city counsel was tasked with ruling on the development plan application in the place of the Planning and Zoning Commission. The Planning and Zoning Commission normally in Dallas would be the one to look at a development plan in the concept of does it meet quantitative standards. Is this met? Yes. Is that met? Yes. Is that met? A ministerial review. In that case, the city counsel, under the unique provisions of that PD ordinance, was tasked with looking at the development plan with that view of those quantitative standards and whether they were met or not. That, I think, was a key reason why the Dallas Court of Appeals said, well, we look at Bryan from this court, the Bryan v. City of Madison case. We look at the standards there to determine whether something is legislative or something is administrative. In that situation, they found it to be administrative because the city counsel functioned as the Planning and Zoning Commission, not as legislators reviewing things. I think that's a key difference. In the Weingarten case, the city counsel there was tasked with looking at the rezoning. I don't want to repeat myself on it, but I think that that is closer here because under Arlington's unique provisions, this was a zoning matter. But if you don't agree with me, I have another argument. The other argument is qualified immunity. Under qualified immunity, this court is well aware of the standards and that there's a one-step and a two-step or a one-prong and a second-prong. Under Saussure and Pearson, the Supreme Court said you don't need to take them in any particular order when you review them. But one of them was what Judge Graves asked about, and that was what is the property interest here? What's the constitutional? And I take that to what is the constitutional right at issue here? I first admit that there was no property right. They didn't have a property right because they had a mere expectancy under the procedures that were in place. They didn't have a right to approval of the development plan because if they did, they'd be saying this was a ministerial act. They should have voted on it like in Bartlett, where it was an administrative thing, and they didn't do that. Well, here there was discretion, and I submit that DVI admits that there was discretion in the city's ordinances, in their pleadings, and that discretion is enough to classify this as a mere expectancy. And if it's a mere expectancy under Texas law, it is not a property right. If you don't have a property right, then there was no violation. But if you go away from the constitutional claim part, Arlington's zoning provisions are unique. There has been no case that has ruled on them. There was nothing previous to this particular instance that would have guided or let the council members know in this specific matter that what they did when they voted the way they did was going to violate someone's rights. In that respect, we urge the court to reverse and render. All right, counsel. Appreciate your explanation, both sides, of this case for us this morning. That is our last case of the day and of the week. We are adjourned.